**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

v.

SURENDRA D. SINGH, a/k/a Sam;
DILIPKUMAR SOMABHAI PATEL, a/k/a
Dan; JALARAM, INCORPORATED,
  *Defendants-Appellees.*

No. 06-4338

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

DILIPKUMAR SOMABHAI PATEL, a/k/a
Dan,
  *Defendant-Appellant.*

No. 06-4812

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

SURENDRA D. SINGH, a/k/a Sam,
  *Defendant-Appellant.*

No. 06-4883

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(3:05-cr-00006-WCB)

Argued: October 30, 2007

Decided: February 8, 2008

Before MICHAEL, MOTZ, and KING, Circuit Judges.

---

Affirmed in part, reversed in part, dismissed in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Michael and Judge Motz joined.

---

**COUNSEL**

**ARGUED:** Stefan Dante Cassella, Asset Forfeiture and Money Laundering Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Michael D. Stein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellant/Cross-Appellee. Dale P. Kelberman, MILES & STOCKBRIDGE, P.C., Baltimore, Maryland; Stephen Henry Kaufman, OFFIT & KURMAN, Owings Mills, Maryland; Paul Gregory Taylor, Martinsburg, West Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** Thomas E. Johnston, United States Attorney, Wheeling, West Virginia, Katharine Goepp, Asset Forfeiture and Money Laundering Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant/Cross-Appellee. Timothy M. Monahan, OFFIT & KURMAN, Owings Mills, Maryland; Robert C. Stone, Jr., Martinsburg, West Virginia, for Appellee/Cross-Appellant Surendra D. Singh.

---

**OPINION**

KING, Circuit Judge:

These appeals arise from a criminal proceeding in the Northern District of West Virginia in which defendants Surendra "Sam" Singh, Dilipkumar "Dan" Patel ("Patel"), and Jalaram, Incorporated (collectively, the "Defendants"), were convicted by jury of a total of fourteen offenses, including conspiracy to violate the Mann Act, in contravention of 18 U.S.C. § 371 (the "Mann Act conspiracy"), ten counts of violating the Mann Act, in contravention of 18 U.S.C. § 2422(a) (the

"Mann Act counts"), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (the "money laundering conspiracy"), and two money laundering offenses, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (the "money laundering counts"). More specifically, each of the Defendants was convicted of eight offenses:

- Singh was convicted of the Mann Act conspiracy (Count 1), five Mann Act counts (Counts 2 through 6), the money laundering conspiracy (Count 12), and a money laundering count (Count 13); and

- Patel and Jalaram were each convicted of the Mann Act conspiracy (Count 1), five Mann Act counts (Counts 7 through 11), the money laundering conspiracy (Count 12), and a money laundering count (Count 14).

The jury also made a criminal forfeiture award to the Government against the Defendants, pursuant to 18 U.S.C. § 982(a)(1) and § 2253, of $670,720.36, plus two motels in Martinsburg, West Virginia.

Each of the fourteen offenses of conviction arose from the Defendants' involvement in an interstate prostitution scheme. After the jury's April 2005 verdict, the court, on August 1, 2005, vacated the Defendants' convictions on the money laundering conspiracy and money laundering counts and awarded them a new trial on these charges. *See United States v. Singh*, No. 3:05-cr-00006-WCB (N.D. W. Va. Aug. 1, 2005) (the "August 1 Order"). Additionally, the August 1 Order vacated Jalaram's convictions on the Mann Act conspiracy and Mann Act counts and granted it a new trial on these charges as well.[1] This Order also vacated the jury's forfeiture award as it related to Jalaram. On March 15, 2006, after the Government sought reconsideration of the August 1 Order, the court granted reconsideration in part and denied it in part. *See United States v. Singh*, No. 3:05-cr-00006-WCB (N.D. W. Va. Mar. 15, 2006) (the "March 15 Order"). The March 15 Order supplanted the new trial award to the Defendants on the money laundering conspiracy and

---

[1]After the court's August 1 Order, the verdict remained intact only as to the convictions of Singh and Patel on the Mann Act conspiracy and Mann Act counts.

money laundering counts with entry of judgments of acquittal. By this Order, the court declined to reconsider its new trial award to Jalaram on the Mann Act conspiracy and Mann Act counts.

The Government has appealed the post-trial rulings made against it by the district court in the August 1 Order and the March 15 Order, seeking reinstatement of those aspects of the verdict that were set aside and replaced with judgments of acquittal and a new trial. Singh and Patel have also appealed, seeking relief from their convictions and sentences on the Mann Act conspiracy and Mann Act counts. As explained below, we reverse the post-trial rulings being challenged in the Government's appeal, and we reject the appeals of Singh and Patel. We thus reinstate the verdict as to Singh and Patel on the money laundering conspiracy and money laundering counts, and as to Jalaram on the Mann Act conspiracy, the Mann Act counts, the money laundering conspiracy, and the money laundering counts. We affirm the convictions of Singh and Patel on the Mann Act conspiracy and Mann Act counts, reinstate the forfeiture award as to Jalaram, and remand.

## I.

### A.

From 2000 to 2003, a prostitution ring known as the "Gold Club" operated out of the Economy Inn and Scottish Inn motels in Martinsburg, West Virginia.[2] The Gold Club was operated by Susan Powell, who has pleaded guilty to a federal tax offense and who testified at trial on behalf of the Government. During the Gold Club's two-and-one-half years of operation, Powell employed approximately fifty prostitutes, using as many as nine motel rooms per day on peak days, and four or five rooms on average days. All together, the Gold Club received proceeds from its operations that totalled more than $670,000. Powell recruited female prostitutes for the Gold Club from West Virginia and the neighboring states of Maryland and Virginia by advertising in newspapers in the three states. Each of the out-of-state

---

[2]We recite the facts in the light most favorable to the prosecution, as the prevailing party at trial. *See United States v. Bursey*, 416 F.3d 301, 304 n.1 (4th Cir. 2005).

prostitutes who testified acknowledged that, when she travelled to work in West Virginia, she did so for the purpose of engaging in prostitution.

The Gold Club began operating out of the Martinsburg Economy Inn in approximately March 2000. Powell negotiated a deal in that regard with Singh, the owner and manager of the Economy Inn and a Gold Club customer. The basic agreement was that the Economy Inn would rent rooms to Gold Club prostitutes at a discounted rate of $40 per day, with the understanding that the rooms would be vacated by 8:00 or 9:00 p.m. each evening. This arrangement allowed Singh to rent these rooms again, to legitimate overnight customers who arrived late in the evening. On some occasions, the Economy Inn would rent the same room to two different prostitutes on the same day — one working early in the day and the other coming in later. Powell would usually communicate with Gold Club prostitutes about their upcoming appointments by telephoning them through the Economy Inn's switchboard. Singh normally operated the switchboard himself and, before connecting Powell to a prostitute's room, would discuss with Powell the appointments of the day.

Initially, the foregoing arrangement between Singh and Powell was satisfactory to everyone involved with the Gold Club. As the Gold Club's operations progressed, however, several prostitutes complained to Powell about paying the Economy Inn for rooms on days when they had no customers. To mitigate this financial burden, Powell began to delay booking rooms at the Economy Inn until after customers made appointments. These delays caused scheduling problems for Singh, who needed to know how many rooms to set aside for the Gold Club's business on a given day. Accordingly, Singh sought and secured from Powell a modification of the Gold Club's rental arrangement: on days the Gold Club's prostitutes had no customers, they did not have to pay for their rooms, provided they did not disturb the rooms and left them in rentable condition; on days that prostitutes had at least one customer, they would pay after the first customer departed. Pursuant to this revised arrangement, which became standard practice, the first daily customer would pay a prostitute in cash for her services (generally $150 an hour), and the prostitute would in turn pay $40 to Singh for an Economy Inn room for the balance of the day, regardless of how many additional customers she had.

In 2001, Powell decided to transfer the Gold Club's operations from the Economy Inn to a new location. Patel, another regular Gold Club customer, was the manager of the Scottish Inn, a motel in Martinsburg owned by Jalaram. While Singh was travelling, Powell visited the Scottish Inn to discuss moving the Gold Club's operations there. Suresh Patel was present, identified himself as the Scottish Inn's owner, and talked with Powell about the Gold Club.[3] Powell explained to Suresh that she ran an "adult entertainment company" and was looking for rooms to rent for that purpose. Suresh advised Powell that she should address the issue with Patel, the Inn's manager, and scheduled a meeting between Powell and Patel for the next day.

At the meeting the next day, Patel and Powell discussed the Gold Club's arrangement with the Economy Inn, specifically that Singh gave the Gold Club's prostitutes a discounted rate of $40 per day at the Economy Inn and waived the daily fee when a prostitute had no customers. Patel and Powell discussed the matter further, and then agreed that the Scottish Inn would match the Economy Inn's terms with the Gold Club. As a result, Powell moved the Gold Club's operations to the Scottish Inn. When Singh learned of the Scottish Inn's arrangement with the Gold Club, he urged Powell to return its business to the Economy Inn, but she declined.

Powell ran the Gold Club's operations at the Scottish Inn as she had at the Economy Inn. She communicated with the prostitutes through the Inn's switchboard and discussed their appointments with Patel. Like Singh at the Economy Inn, Patel would monitor the Gold Club's customers at the Scottish Inn to ensure that the prostitutes paid for their rooms after their first customer. The prostitutes paid for their rooms at the Scottish Inn as they had at the Economy Inn: using $40 of the receipts from the first daily customer to pay for a room for the balance of the day.

As the manager of the Scottish Inn, Patel was responsible for its daily operations. He registered guests, accepted room rental payments, and cleaned rooms after they had been occupied. In carrying

---

[3]Suresh Patel was the President of Jalaram and, along with his wife, was one of its two stockholders.

out these duties, Patel and his wife lived and worked at the Scottish Inn seven days a week, twenty-four hours a day. Suresh Patel, the Inn's owner, visited the Scottish Inn a few times each month, and would assist at the Inn when, for example, Patel went to the bank. With the exception of his visits to the bank, Patel was generally present at the Scottish Inn and in charge of its operations.

The Gold Club operated out of the Scottish Inn for about six months in late 2001 and early 2002, but its prostitutes were not happy there. With Powell's approval, several of the Gold Club's prostitutes returned to the Economy Inn. Consequently, for a short period of time the Gold Club operated at both motels simultaneously. Eventually, Powell moved the Gold Club's operations back to the Economy Inn, primarily in response to problems involving Patel and the Gold Club's prostitutes.[4] Patel may well have kept for himself a substantial portion of the cash payments he received from the prostitutes for the Scottish Inn rooms. During the period the Gold Club operated at the Scottish Inn, however, Jalaram received a minimum of $700 from the Gold Club's operations. The prosecution contends that, under the evidence, the payments actually received by Jalaram were several times that amount.[5]

After Powell returned the Gold Club's operations to the Economy Inn, Patel pleaded with her to bring them back to the Scottish Inn, stating: "I'm in a lot of trouble. . . . My owner said I had to get your business back. I'll even go $38 a day instead of $40, but I must get your business back." J.A. 245.[6] Powell declined this proposal and

---

[4]According to Powell, Patel had propositioned the prostitutes to trade sex for the $40 room payments and, on certain occasions, used his master key to enter rooms at the Scottish Inn when a prostitute was with a customer.

[5]The prosecution contends that Jalaram received substantially more than $700 from the Gold Club's operations because that estimate was reached by using registration forms that the prostitutes completed at the Scottish Inn. Under the evidence, those forms were only occasionally filled out by Gold Club prostitutes and probably account for only a small portion of the payments made by the prostitutes.

[6]Citations to "J.A. ____" refer to the Joint Appendix filed by the parties in this appeal.

continued to operate the Gold Club out of the Economy Inn. The Gold Club's operations ceased after a police raid that occurred on July 4, 2003, when Powell was arrested.

## B.

On March 14, 2005, a grand jury in the Northern District of West Virginia returned its fourteen-count superseding indictment charging the Defendants, plus Suresh Patel, with offenses arising out of the Gold Club's operations at the two Martinsburg motels.[7] As spelled out above, the Defendants were charged with two separate conspiracy offenses: first, the Mann Act conspiracy, in contravention of 18 U.S.C. § 371,[8] and, second, the money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).[9] Additionally, each defendant was

---

[7]Suresh Patel, the President of Jalaram, was charged in the indictment, but the jury found him not guilty on all charges.

[8]Section 371 of Title 18, under which Count 1 arose, makes it a federal crime to conspire to commit an offense against the United States. The Mann Act, the object of the Count 1 conspiracy, and the basis of the charges in Counts 2 through 11, provides that "[w]hoever knowingly persuades [or] induces . . . any individual to travel in interstate . . . commerce, . . . to engage in prostitution," shall be fined or imprisoned or both. 18 U.S.C. § 2422(a).

[9]Pursuant to the conspiracy provision of the money laundering statute, under which Count 12 was alleged, "[a]ny person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for . . . the object of the conspiracy." 18 U.S.C. § 1956(h). The promotion money laundering statute, the object of the Count 12 conspiracy, and the basis of the charges in Counts 13 and 14, provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of a specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity [shall be fined or imprisoned, or both].

18 U.S.C. § 1956(a)(1)(A)(i). The Mann Act is an offense included in the money laundering statute's designation of what constitutes a "specified unlawful activity." *See id.* at §§ 1956(c)(7)(A) and 1961(1)(B).

charged with five Mann Act counts, plus a money laundering count.[10] The indictment also contained a criminal forfeiture allegation, made pursuant to 18 U.S.C. § 982(a)(1) and § 2253, seeking forfeiture of the Economy Inn and the Scottish Inn, plus the sum of $673,020.[11]

A jury trial was conducted in Martinsburg over a six-day period in April 2005, and the jury, on April 20, 2005, returned a guilty verdict against the Defendants on all fourteen counts. On April 21, 2005, the jury responded to a special interrogatory on the criminal forfeiture allegation, finding that $670,072.36 (the aggregate proceeds from the Gold Club's operations), plus the Economy Inn and the Scottish Inn, were subject to forfeiture. The Defendants thereafter filed post-trial motions and, on August 1, 2005, the district court entered its Order that first addressed those motions.

By its August 1 Order, the court vacated the Defendants' convictions on the money laundering conspiracy and money laundering counts for insufficiency of evidence, and granted the Defendants, pursuant to Federal Rule of Criminal Procedure 33, a new trial on those charges.[12] The money laundering counts flowed from the financial arrangements made between the two motels, on the one hand, and Powell and the Gold Club, on the other, whereby a prostitute paid for

---

[10]The Mann Act, named for its sponsor, Congressman Mann of Illinois, was enacted in 1910 as the White Slave Traffic Act. *See* Judith Resnik, *Law's Migration: American Exceptionalism, Silent Dialogues, and Federalism's Multiple Ports of Entry*, 115 Yale L.J. 1564, 1660-61 (2006). The original Mann Act made it illegal to transport interstate "any woman or girl for the purpose of prostitution, debauchery, or for any other immoral purpose." White Slave Traffic (Mann) Act, Pub. L. No. 61-277, 36 Stat. 825 (1910) (current version at 18 U.S.C. §§ 2421-2424 (2000)). The Mann Act was amended in 1986 to its current version.

[11]Section 982(a)(1) is the criminal forfeiture statute for money laundering offenses, including § 1956(a)(1)(A)(i) and (h). At the time of the offenses alleged in the indictment, § 2253 was the criminal forfeiture provision for violations of the Mann Act. Insofar as it applies to the Mann Act, § 2253 has since been repealed and replaced with another forfeiture provision. That amendment has no bearing on this appeal.

[12]Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

her motel room on a given day with a portion of the funds received from her first customer. The prosecution's theory was that such room rental payments constituted financial transactions involving criminal proceeds intended to promote the carrying on of a "specified unlawful activity" — i.e., violations of the Mann Act — in contravention of § 1956(a)(1)(A)(i). In awarding a new trial to the Defendants on the money laundering conspiracy and money laundering counts, the court ruled that, as a matter of law, money laundering had not occurred because the room rental payments did not involve the "proceeds" of Mann Act violations.[13]

In its August 1 Order, the district court also vacated Jalaram's convictions on the Mann Act conspiracy and Mann Act counts, and granted it a new trial on those charges. Jalaram's convictions were based on the prosecution's theory of corporate criminal liability, i.e., that Jalaram was criminally liable for the acts of Suresh Patel, as its owner, and Patel, as the Scottish Inn's manager. The court concluded, however, that there was insufficient evidence to render Jalaram criminally liable, and ruled that it had erred at trial in failing to instruct the jury on Patel's possible status as an independent contractor.

On August 19, 2005, the Government sought reconsideration of the court's August 1 Order, asserting that the court had erred in its post-trial rulings, requesting that the convictions on the money laundering conspiracy and money laundering counts be reinstated, and urging that Jalaram's convictions on the Mann Act conspiracy and Mann Act counts also be reinstated. On March 15, 2006, the district court granted partial reconsideration of its August 1 Order. First, on the money laundering conspiracy and money laundering counts, the court's March 15 Order replaced its earlier award of a new trial to the Defendants with judgments of acquittal, entered pursuant to Rule 29(c).[14] Second, on the Mann Act conspiracy and Mann Act counts

---

[13]The district court explained the reasoning for its August 1 Order orally in a proceeding it conducted on July 22, 2005. *See* J.A. 610-11. Although this proceeding was docketed as a post-trial "motions hearing," the court referred to it as a "status conference." As a result, we also refer to the July 22 proceeding as a status conference.

[14]Federal Rule of Criminal Procedure 29(c) provides that a defendant may move for judgment of acquittal after a guilty verdict, and "the court may set aside the verdict and enter an acquittal."

against Jalaram, the court declined to reconsider its prior ruling in the August 1 Order, leaving intact its award of a new trial to Jalaram on those charges.[15]

On March 24, 2006, the Government filed a notice of appeal from the adverse post-trial rulings made by the district court. On July 17, 2006, the district court conducted sentencing proceedings for Singh and Patel, and sentenced them to fifteen months on each of their six convictions, with those sentences to run concurrently. Final judgments were entered in the district court on July 28, 2006, and Singh and Patel have filed timely notices of appeal. On August 28, 2006, we consolidated these three appeals, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We first assess the contentions made by the Government in its appeal. In that regard, the Government has appealed (1) the district court's March 15 Order granting judgments of acquittal to the Defendants on the money laundering conspiracy and the money laundering counts, and (2) the court's earlier award, made in its August 1 Order, of a new trial to Jalaram on the Mann Act conspiracy and Mann Act counts.

## A.

The Government first contends that it was error for the district court to award judgments of acquittal to the Defendants on the money laundering conspiracy and money laundering counts because of an insufficiency of evidence. We review de novo an award of judgment of acquittal. *See United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004). In assessing such an issue, we view the evidence in the light most favorable to the prosecution, and inquire whether a rational trier

---

[15]The judgments of acquittal on the money laundering conspiracy and money laundering counts rendered the special interrogatory on criminal forfeiture moot to the extent it was based on these offenses. Because all of Jalaram's convictions were vacated in the post-trial proceedings, the court could neither impose a forfeiture award against Jalaram nor order the forfeiture of any of its property.

of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Id.*

The Defendants were each charged, in Counts 13 and 14, with a single substantive count of money laundering. The statute underlying those offenses, 18 U.S.C. § 1956(a)(1)(A)(i), renders it unlawful to conduct a financial transaction with the intent to promote the commission or the continuation of a "specified unlawful activity," an offense commonly referred to as "promotion money laundering." *See United States v. Alerre*, 430 F.3d 681, 693 n.14 (4th Cir. 2005) (contrasting "promotion money laundering" with "concealment money laundering," which may be committed by transfer of funds "to conceal or disguise" their illegal origins). The Defendants were also charged in Count 12 with the money laundering conspiracy, in contravention of 18 U.S.C. § 1956(h).

1.

In order to secure a conviction on a promotion money laundering charge, the prosecution is obliged to prove four elements beyond a reasonable doubt: (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a specified unlawful activity; (3) the defendant knew at the time of the transaction that the property involved proceeds of an unlawful activity; and (4) the defendant intended to promote the carrying on of the specified unlawful activity. *See United States v. Bolden*, 325 F.3d 471, 486-87 (4th Cir. 2003). Although the jury convicted the Defendants on the money laundering counts, the trial court, in its August 1 Order, vacated these convictions, as well as the Defendants' convictions on the money laundering conspiracy, and granted a new trial. On reconsideration, the court, on March 15, 2006, granted judgments of acquittal to the Defendants on all three charges. The court's explanation for the judgments of acquittal was brief, and its March 15 Order simply referenced its August 1 Order. In the August 1 Order, the court concluded that the evidence failed to support the guilty verdict on these counts for the reasons spelled out in the status conference of July 22, 2005.

At the conference of July 22, 2005, the court, relying primarily on our decisions in *United States v. Butler*, 211 F.3d 826 (4th Cir. 2000),

and *United States v. Heaps*, 39 F.3d 479 (4th Cir. 1994), addressed the money laundering issues and orally explained its view that

> based upon [these decisions], the payment for the room did not represent proceeds. And the Court further concludes under the Government's theory of the prostitute giving money to a coconspirator for the room, actually dividing money amongst the coconspirators, that there was no financial transaction involved. *Butler* and *Heaps* emphasized that the money laundering statutes were to create a new and distinct offense away from the underlying crime. Here, the specific Mann Act violations. The *Butler* case also held that the laundering of funds cannot occur in the same transaction through which the funds first became tainted by a crime.

J.A. 610-11.

As explained below, the *Butler* and *Heaps* decisions are readily distinguishable from this case, and they provide scant support for the post-trial money laundering rulings of the trial court. In *Butler*, the defendant had been convicted of money laundering as well as bankruptcy fraud. *See* 211 F.3d at 827. On appeal, Butler contended that his money laundering convictions were defective because they were premised on the same transactions that had resulted in his bankruptcy fraud conviction. *Id.* We concluded that, although "the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime," that legal principle did not assist Butler, in that the prosecution had presented sufficient evidence to prove that, at the time the money laundering offense occurred, Butler had already completed a phase of the bankruptcy fraud. *Id.* at 830. Ultimately, these facts were sufficient to satisfy the requirement that the property used in the money laundering transaction was "criminally derived." *Id.*

As the *Butler* decision shows, the district court was correct on July 22, 2005, in explaining that a money laundering offense "cannot occur in the same transaction through which those funds first became tainted by crime." J.A. 611. The court was incorrect, however, in concluding that this legal principle somehow nullified the convictions of the Defendants on the money laundering conspiracy and the money

laundering counts. In a money laundering offense, the property involved in the transaction must represent the proceeds of "an already completed offense, or a completed phase of an ongoing offense." *Butler*, 211 F.3d at 829 (internal quotation marks omitted). Under this evidence, a prostitution offense was complete when a Gold Club prostitute received money from her customer in exchange for her services. At the moment the prostitute received those funds, they represented, on this evidence, the criminally derived proceeds of a Mann Act offense. From then on, if the other elements of money laundering were satisfied, a financial transaction involving those funds and promoting the Gold Club's operations constituted a money laundering offense.

In response, the Defendants assert that the district court got it right — a Mann Act violation could not be completed until the prostitute paid her $40 room charge to the motel, thus precluding any such payment from constituting a money laundering offense. Unfortunately for the Defendants, this contention does not pass muster. Put simply, prostitution offenses can occur in multiple locations, and the use of motel rooms is not an essential aspect thereof. Because a motel room is not necessary for prostitution, the Mann Act had already been violated when the Gold Club prostitutes paid for rooms at the Economy Inn and Scottish Inn, and these payments were thus made with criminally derived proceeds.[16]

In explaining its ruling, the district court also relied on our decision in *Heaps*. There, Heaps had delivered drugs on consignment to a third party, who sold them at retail and paid Heaps from the proceeds. *See*

---

[16]Even if we were to conclude that a Mann Act violation was not complete until a motel room had been paid for, the Defendants could not prevail. As we recognized in *Bolden*, "the key inquiry is not whether the specified unlawful activity was completed prior to the alleged money laundering transaction," but "whether the specified unlawful activity generated proceeds prior to the money laundering, and whether the money laundering actually involved those criminally-derived proceeds." 325 F.3d at 488. Under *Bolden*, only an identifiable "phase" of the unlawful activity must be completed prior to the money laundering transaction. And, at minimum, such a phase of the Mann Act violation was complete when the first customer of the day paid the prostitute for her services.

39 F.3d at 484. The jury found Heaps guilty of promotion money laundering on the basis of such payments, and we reversed. As the majority explained, the transaction constituted a one time payment on an antecedent debt that would not support a conviction for promoting the "carrying on" of a specified unlawful activity. *Id.* at 485-86. The *Heaps* ruling relied on the fact that no evidence had been presented to show that such payments were made to create goodwill for subsequent drug transactions. *Id.* at 484. Furthermore, we observed that

> [n]ot only were there no subsequent drug transactions, but neither [was there evidence] that the purpose of the payment was to encourage the defendant to supply more drugs. Rather, the payment was merely to satisfy a debt of a completed and, as far as the record shows, the final transaction.

*Id.*

Contrary to the facts of *Heaps*, the payments made by the Gold Club's prostitutes to Singh and Patel for rooms at the Economy Inn and Scottish Inn were not one time payments on an antecedent debt. These payments occurred after a prostitute's first daily customer, making the payments part of the prostitution scheme that the Gold Club operated for more than two years. Moreover, such payments were made with receipts from the first daily customers, and allowed the prostitutes to service other customers thereafter. *Heaps* is thus readily distinguishable on its facts, and any reliance thereon is misplaced.

As a result, the Government presented ample evidence to satisfy the elements of the money laundering counts. First, a financial transaction occurred when a prostitute paid the Inn manager (Singh or Patel) $40 in cash for the daily use of a room at the Economy Inn or the Scottish Inn. Second, the $40 payment constituted the criminally derived proceeds of a Mann Act offense. Third, Singh and Patel both knew that the $40 payments came from prostitution activities, and had agreed that the Gold Club's prostitutes would pay for rooms with cash received from their first customer each day. Fourth, Singh and Patel (as well as Suresh Patel) intended to promote the carrying on of unlawful Mann Act activities, by providing the Gold Club's prostitutes with discounted room rates. Importantly, Singh and Patel had

agreed not to require payment from the prostitutes if they had no daily customers, in order to encourage the Gold Club's continued use of the Martinsburg motels. Viewed in the proper light, the evidence satisfies the elements of promotion money laundering and the court erred in awarding judgments of acquittal on the money laundering counts.

2.

As mentioned above, the Government's appeal also challenges the judgments of acquittal awarded to the Defendants on the money laundering conspiracy. In order to prove that conspiracy, alleged under 18 U.S.C. § 1956(h), the prosecution was obliged to establish that: (1) an agreement to commit money laundering existed between one or more persons; (2) the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *See Alerre*, 430 F.3d at 693-94. As the evidence demonstrated, and pursuant to our discussion of the money laundering counts, the elements of money laundering conspiracy were satisfied. Under the evidence, agreements existed between Powell and the Economy Inn (through Singh), and also between Powell and the Scottish Inn (through Patel and Suresh Patel), concerning the Gold Club's operations and the involvement of those motels therein. Singh and Patel (as well as Suresh Patel) each knew the details of the Gold Club's operations, and they had arranged with Powell for discounted room rates at the Economy Inn and the Scottish Inn. Under the evidence, Singh, Patel, and Jalaram thus entered knowingly and voluntarily into the money laundering conspiracy. As a result, the judgments of acquittal on the money laundering conspiracy must also be vacated.

3.

Because a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, was entitled to find that the money laundering conspiracy and the money laundering counts had been proven beyond a reasonable doubt, the convictions of the Defendants on those offenses, as set forth in Counts 12, 13, and 14, must be reinstated.[17] We are therefore obliged to remand for resentencing on these counts.

---

[17]The validity of the convictions of Jalaram on the money laundering conspiracy and money laundering counts (as well as our reinstatement of them) is dependent upon our resolution of the corporate criminal liability issue being pursued in the Government's appeal. *See infra* Part II.B.

B.

Next, the Government maintains that the district court erred in granting a new trial to Jalaram on its convictions on the Mann Act conspiracy and Mann Act counts. A district court may, in its discretion, award a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Thus, we review an award of a new trial for abuse of discretion. *See United States v. Lentz*, 383 F.3d 191, 219 (4th Cir. 2004). Despite this deferential standard, however, we have recognized that, "[u]nder the applicable legal principles, a trial court 'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 216-17 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)). We also review a trial court's jury instructions for abuse of discretion. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 n.11 (4th Cir. 2003).

In its August 1 Order, the district court concluded that "the evidence adduced at trial does not support the jury's finding that Dan Patel was acting in furtherance of the corporation." Prior to issuing that Order, at the status conference of July 22, 2005, the court observed that "something of an independent contractor exception should have occurred," because the evidence showed that "Patel was acting on his own behalf [and] not for the benefit of the corporation Jalaram." J.A. 613. As a result, the court, by its August 1 Order, awarded Jalaram a new trial on its convictions.

We have recognized that "a corporation is liable for the criminal acts of its employees and agents done within the scope of their employment with the intent to benefit the corporation." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 63 (4th Cir. 1993). The appropriate "scope of employment" of such an employee or agent has been defined to include all those acts falling within the employee's or agent's general line of work, when they are motivated — at least in part — by an intent to benefit the corporate employer. *See United States v. Automated Med. Labs.*, 770 F.2d 399, 406-07 (4th Cir. 1985) (internal quotation marks omitted).[18]

---

[18]The terms "employee" and "agent" sometimes have been used interchangeably in the context of corporate criminal liability. *See Automated*

In this situation, the district court apparently perceived that the evidence failed to establish Jalaram's corporate criminal liability based on the conduct of Patel. The court also perceived that, but for instructional error, Jalaram would have been acquitted. In so ruling, the court erred, first, in determining, that the evidence was insufficient to sustain the finding of corporate criminal liability against Jalaram, and, second, in concluding that instructional error had occurred. As explained above, a corporate accused is liable for the criminal acts of its "employees and agents" acting "within the scope of their employment" for the "benefit [of] the corporation," *Mylan Labs.*, 2 F.3d at 63, and such liability arises if the employee or agent has acted for his own benefit as well as that of his employer, *see Automated Med. Labs.*, 770 F.2d at 407.

Under the evidence, viewed in the light most favorable to the prosecution, the court erred in failing to recognize that Patel, as manager of the Scottish Inn, was an agent of Jalaram, and was acting within the scope of that relationship when he rented rooms to the Gold Club's prostitutes. The court also misperceived the importance of the fact that Powell first spoke with Jalaram's President, Suresh Patel, about moving the Gold Club's operations to the Scottish Inn — explaining to him that she ran an "adult entertainment company" and was looking for rooms to rent for that purpose — and that, in response, Suresh advised Powell to speak to his manager (Dan Patel) about this issue. Suresh Patel then actually set up the meeting between Powell and Dan Patel.[19] The evidence demonstrates that Patel thereaf-

---

*Med. Labs.*, 770 F.2d at 406-07. It has been consistently recognized, however, that an important aspect of a corporate criminal liability issue is whether the employer or agent (by whichever term utilized) was acting within the scope of his duties. *See id.*; *see also United States v. Basic Construction Co.*, 711 F.2d 570, 572 (4th Cir. 1983); *Old Monastery Co. v. United States*, 147 F.2d 905, 908 (4th Cir. 1945).

[19]From this evidence, the jury was entitled to find that Jalaram's involvement in the Gold Club's operations had actually been initiated and agreed to by Suresh Patel (Jalaram's President and part owner). As the Government contends, such an agreement between Suresh and Powell itself rendered Jalaram criminally liable, without regard to the fact that Suresh was indicted and acquitted. *See United States v. Dotterweich*, 320 U.S. 277, 279 (1943) ("Whether the jury's verdict was the result of carelessness or compromise . . . is immaterial. Juries may indulge in precisely such motives or vagaries.").

ter received funds from the Gold Club prostitutes with the intent — at least in part — of benefitting Jalaram. Jalaram received, by its own admission, at least $700 from the Gold Club's prostitution enterprise. And the jury was entitled to find, under the evidence, that such receipts substantially exceeded that sum. In these circumstances, the evidence of Jalaram's corporate criminal liability did not at all weigh heavily against the verdict as to Jalaram, but was wholly sufficient to support it.

Moreover, contrary to the district court's conclusion that it erred in instructing the jury, the instructions properly explained the controlling legal principles on the issue of corporate criminal liability. In this regard, the jury was instructed on three important legal points:

- A corporation may be responsible for the actions of its agents done or made within the scope of their authority;

- The term "scope of employment" refers to acts on the corporation's behalf in performance of an agent's general line of work. To be acting within the scope of his employment, those acts must be motivated, at least in part, by an intent to benefit the corporation; and

- An agent may act for his own benefit while also acting for the benefit of the corporation.

*See* J.A. 564-66. As a result, the court made an error of law — thereby abusing its discretion — in concluding, during the July 22, 2005 status conference, that an independent contractor instruction should have been given to the jury. *See RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356 (4th Cir. 2007) ("By definition, a district court abuses its discretion when it makes an error of law.").[20]

---

[20]Because of our disposition of the corporate criminal liability issue, we need not reach and dispose of the Government's alternative contention that, from a legal standpoint, there is no independent contractor exception to corporate criminal liability. We note, however, that the Government makes a compelling argument in that regard, asserting that

the leading treatises recognize, for purposes of imposing criminal liability, [that] "a court may be unconcerned with technical

The court further abused its discretion by relying on the perceived instructional error to award a new trial to Jalaram in the face of trial evidence that fully supported (rather than weighed heavily against) the jury's verdict. *See Smith*, 451 F.3d at 216-17; *Perry*, 335 F.3d at 320. The award of a new trial to Jalaram is thus vacated and the verdict is reinstated on the Mann Act conspiracy and Mann Act counts against Jalaram.[21] We remand on those convictions for the appropriate sentencing proceedings.

### III.

Having disposed of the Government's appeal, we now turn to the contentions of defendants Singh and Patel in their separate appeals. They maintain, first of all, that the district court erred in denying their motions for judgments of acquittal on the Mann Act conspiracy and Mann Act counts. They also contend that the court erred in declining to sever their trials, in denying their *Batson* challenge to the prosecution's exercise of a peremptory juror strike, and in excluding evidence regarding Powell's daughters' involvement in the Gold Club's operations. We address these contentions in turn.[22]

---

distinctions between agents and independent contractors." 1 Brickey, Corporate Criminal Liability § 3:05, at 104 (2d ed. 1991) ("The lines of reasoning used to support imposition of corporate liability for criminal misconduct of subordinate employees have also been advanced to impose liability on a corporation for acts of those who are not, strictly speaking, its employees."); *see also* 2 LaFave, *supra*, § 13.5(c), at 390-91 (describing limits on corporate criminal liability, but making no mention of an independent contractor defense). The rule "prevent[s] corporations from avoiding liability by simply contracting-out the more risky elements of their business." Joseph S. Hall, Corporate Criminal Liability, 35 Am. Crim. L. Rev. 549, 553 (1998).

Br. of Appellant 52.

[21]As a result of this ruling, sustaining Jalaram's criminal liability for the acts of its agents, the money laundering conspiracy and money laundering counts against Jalaram must also be reinstated. *See supra* note 17.

[22]Singh initially presented on appeal a contention concerning the constitutionality of the forfeiture award made against him. The dispute underlying the forfeiture issue has recently been resolved by the parties, however, and their joint suggestion of partial mootness, docketed as a motion for partial dismissal of appeal, is hereby granted. Singh's challenge to the forfeiture award is thus dismissed as moot.

A.

First and foremost, Singh and Patel contend that the district court erred in failing to award them judgments of acquittal on the Mann Act conspiracy and Mann Act counts. Again, we review de novo a trial court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the Government. *See United States v. Midgett*, 488 F.3d 288, 297 (4th Cir. 2007).

In pursuing this contention, Singh and Patel maintain that there was insufficient evidence to convict them on these charges because there was no evidence that they had induced the Gold Club's prostitutes to travel in interstate commerce, or that they had any knowledge of Powell's inducements in that regard.[23] The Government's primary argument against this contention is that, notwithstanding whether Singh and Patel had knowledge of such inducements, they had conspired with Powell and are thus criminally liable on the substantive Mann Act counts on the principles of *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946) (concluding that acts in furtherance of conspiracy are "attributable to the others for the purpose of holding them responsible for the substantive offense," when those acts are reasonably foreseeable as necessary or natural consequence of unlawful agreement).

1.

In order to prove the Mann Act conspiracy, alleged under § 371 of Title 18, the prosecution was obliged to produce evidence that: (1) there was an agreement to violate the Mann Act; (2) the defendants knowingly and willingly participated in that conspiratorial endeavor; and (3) an overt act was committed in furtherance of the conspiracy. *See* 18 U.S.C. § 371; *see also United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004). Singh and Patel contend that, although they agreed with Powell to participate in a prostitution scheme, they were unaware of the interstate component of the Gold Club's operations and thus cannot be convicted of the Mann Act conspiracy.

---

[23]A Mann Act offense has occurred when an accused has knowingly induced an individual to travel in interstate commerce to engage in prostitution. *See supra* note 8.

a.

Contrary to Singh and Patel's assertion, the evidence established that they had actual knowledge of the interstate component of the Gold Club's operations. The prosecution presented evidence that, on multiple occasions, Singh and Patel required Gold Club prostitutes to complete room registration forms, and that, in completing such forms, the prostitutes listed their out-of-state addresses. For Patel at the Scottish Inn, such registration forms covered the period from July 2001 to January 2002. For Singh at the Economy Inn, such forms were completed over the period from December 2002 to April 2003.

Singh and Patel maintain, however, that the mere existence of these registration forms is insufficient proof of their knowledge, because there is no evidence that either of them actually looked at such forms. In their view, the lack of such direct evidence is fatal to their Mann Act conspiracy convictions. Viewing the evidence in the light most favorable to the prosecution, however, a reasonable jury was entitled to conclude that, under the circumstances, both Singh and Patel had examined such forms and were aware of the fact that the Gold Club's prostitutes were travelling interstate to engage in prostitution. The dates of these registration forms show that Patel knew of the interstate component of the Gold Club's operations by July 25, 2001, and that Singh possessed such knowledge by December 21, 2002. As a result, the evidence was sufficient for the jury to find that Singh and Patel had knowledge of the interstate component of the Gold Club's activities.[24]

---

[24]Although not at issue on appeal, there may have been a variance between the allegation and the proof on when the Mann Act conspiracy began. The indictment specifies that "[f]rom in or about May 2000, and continuing through about July 4, 2003," the Defendants conspired with Powell to induce individuals to travel in interstate commerce to engage in acts of prostitution, in violation of the Mann Act. The date of the first registration form involving Patel is July 25, 2001, and the date of the first registration form involving Singh is December 31, 2001. Any variance between the indictment and the proof was nonprejudicial, however, because such a variance would not, in these circumstances, "modify the elements of the charged offense." *United States v. Davis*, 202 F.3d 212, 216 n.3 (4th Cir. 2000).

b.

Although there was sufficient evidence to establish that Singh and Patel had knowledge of the interstate component of the Gold Club's operations, the lack of such knowledge would not necessarily have been dispositive in their favor. *See United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."). As the Ninth Circuit recognized in an analogous case, in order to convict a defendant of conspiracy to violate the Mann Act, there must be sufficient evidence to prove that he

> directly agreed to a scheme in which it was known that the likelihood of illegal interstate transportation was great (it being understood that such agreement need not be overt, and may be inferred from circumstantial evidence; and that directness refers not to face-to-face dealings, but to the extent of his knowledge of the purpose and scope of the conspiracy).

*Twitchell v. United States*, 313 F.2d 425, 429 (9th Cir. 1963), *vacated in part sub nom. Rogers v. United States*, 376 U.S. 188 (1964), *remanded to sub nom. Twitchell v. United States*, 330 F.2d 759 (9th Cir. 1964).

In the light most favorable to the prosecution, the evidence demonstrated that it was likely that Powell would be inducing Gold Club prostitutes to travel in interstate commerce. Both the Economy Inn and the Scottish Inn are located in Martinsburg, West Virginia, less than fifteen miles from Virginia and Maryland, and less than thirty miles from Pennsylvania. The Martinsburg location alone made it entirely reasonable to conclude that Powell would be soliciting prostitutes from nearby states in the Gold Club's operations. Because such inducements to cross state lines were readily foreseeable, this contention on the Mann Act conspiracy must also be rejected.

2.

We next assess Singh and Patel's contention that they should have been awarded judgments of acquittal on the substantive Mann Act

counts. Based on *Pinkerton* principles, Singh and Patel, as coconspirators, were responsible for any substantive acts that Powell and the other conspirators committed that were reasonably foreseeable and in furtherance of the Mann Act conspiracy. *See United States v. Bonetti*, 277 F.3d 441, 447 (4th Cir. 2002) (explaining that defendant's "conspiracy conviction makes him liable for all substantive offenses of his coconspirator that are both reasonably foreseeable and in furtherance of the conspiracy"). Clearly, Powell's leading role in the Gold Club's operations made her a primary conspirator in the Mann Act conspiracy. And she acknowledged that she had advertised in newspapers in both Maryland and Virginia, seeking women to serve as "escorts" in Martinsburg for the Gold Club. She also explained that the use of such out-of-state prostitutes was essential to the Gold Club's operations, because they were more experienced and thus easier to manage than in-state prostitutes. Under this evidence, Powell conspired with both Singh and Patel to violate the Mann Act, and committed numerous substantive Mann Act offenses, by knowingly inducing women to cross state lines for the purpose of engaging in prostitution. Thus, under *Pinkerton* principles, the jury was entitled to find that Singh and Patel were criminally responsible for the charges alleged in the Mann Act counts.

B.

Singh and Patel next maintain that the district court erred in excluding evidence of Powell's bias against them, by precluding their use of evidence that Powell's juvenile daughters were involved in the Gold Club's operations. At trial, Singh and Patel sought to show that Powell had agreed to cooperate with the Government in order to protect her daughters from being prosecuted for their participation in the Gold Club's activities. The court, however, barred the use of any such evidence.

We review a district court's decision to exclude evidence for abuse of discretion. *See United States v. Young*, 248 F.3d 260, 266 (4th Cir. 2001). Viewed in this light, this claim of evidentiary error lacks merit. Powell's plea agreement was available to the defense, and it does not include an immunity agreement for Powell's daughters. Singh and Patel were thus unable to demonstrate a good faith basis for questioning Powell or other witnesses about Powell's daughters' possible

involvement in the Gold Club, and the court did not abuse its discretion in ruling as it did.

### C.

Singh and Patel also contend that the prosecution improperly utilized one of its peremptory strikes to remove an African American juror from the jury panel, in contravention of the principles of *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that Equal Protection Clause precludes prosecutors from challenging potential jurors solely on account of their race). "A finding by the district court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference and is thus reviewed only for clear error." *United States v. Blanding*, 250 F.3d 858, 860 (4th Cir. 2001) (internal quotation marks omitted). In the jury selection proceedings in this trial, an African American woman, the only remaining potential minority juror on the panel, was struck by the prosecution's exercise of a peremptory challenge. The Defendants contend that, in so doing, the Government violated the *Batson* principles.

When a party pursues a *Batson* challenge, the trial court is obliged to conduct a three-part inquiry. *See Bell v. Ozmint*, 332 F.3d 229, 239 (4th Cir. 2003). First, the objecting party must make a prima facie showing that the prosecution exercised a peremptory challenge on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecution to articulate a race-neutral reason for striking the juror. *Id.* Finally, the trial court must determine whether the objecting party has carried its burden of proving purposeful racial discrimination. *Id.*

At trial, Singh and Patel maintained that the prosecution had stricken the black female juror for reasons of race. As a result, the court directed the prosecution to explain the basis for its peremptory strike. In response, the court was advised that the juror appeared to be too "anxious to serve on the panel," and that "anybody who really wants to serve on a panel, we're worried about." J.A. 114. The court deemed this explanation to be race-neutral, and thus ruled that the juror strike did not contravene *Batson*.

Singh and Patel contend on appeal that the prosecution's explanation for the juror strike is not plausible, and thus was a pretext. As we recognized in *United States v. Grimmond*, however, the "explanation need not be persuasive or even plausible, as long as it is neutral." 137 F.3d 823, 834 (4th Cir. 1998) (internal quotation marks omitted). The prosecution's explanation for peremptorily challenging the African American juror was, on its face, race-neutral. As the trial court recognized, Singh and Patel thus failed to carry their burden of proving that the explanation was pretextual. As a result, the court did not abuse its discretion in denying the *Batson* contention.

D.

Finally, Singh and Patel contend that their trial should have been severed from their other codefendants, and from each other, and that the district court erred in denying their severance requests. More specifically, Singh maintains that the court improperly denied his motion for a severance because the evidence relating to Patel and Suresh Patel resulted in severe prejudice to him. Patel, on the other hand, argues that his trial should have been severed from the prosecution of Suresh Patel and Jalaram because their defenses were pursued in a manner prejudicial to him. For example, Suresh Patel and Jalaram maintained at trial that Patel had been skimming cash from the receipts of the Scottish Inn for his own benefit, and thus not acting for the benefit of Jalaram.

We review a district court's denial of a severance for abuse of discretion. *See United States v. Khan*, 461 F.3d 477, 490 (4th Cir. 2006). Two or more defendants may be charged in the same indictment if they are alleged to have "participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Generally, we adhere to the principle that defendants indicted together should be tried together, and an appellant must show that he was prejudiced by the denial of a severance motion in order to establish that the trial court abused its broad discretion in that regard. *See United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001). "[T]he mere presence of hostility among defendants . . . or a desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials." *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (internal quotation

marks omitted). In this instance, Singh and Patel failed to show prejudice from the denial of their severance motions. They have simply asserted that some of the evidence concerning their codefendants was unfavorable to them. As we explained in *Najjar*, such a situation does not mandate the award of a trial severance, and the court thus did not abuse its discretion in denying the severance requests.

## IV.

Pursuant to the foregoing, we reverse the judgments of acquittal awarded to the Defendants on the money laundering conspiracy and money laundering counts (Counts 12 through 14), as well as the new trial award made to Jalaram on the Mann Act conspiracy and Mann Act counts (Counts 1 and 7 through 11). We also affirm the convictions of Singh and Patel on the Mann Act conspiracy and Mann Act counts (Counts 1 through 11). Finally, we dismiss Singh's challenge to the forfeiture award as moot. The verdict is hereby reinstated, and we remand for appropriate sentencing proceedings and for such other proceedings as may be warranted.

*AFFIRMED IN PART, REVERSED IN PART,*
*DISMISSED IN PART, AND REMANDED*