### COMMODITY FUTURES TRADING COMMISSION

v.

### EQUITY FINANCIAL GROUP LLC; Tech Traders, Inc.; Vincent J. Firth; Robert W. Shimer; J. Vernon Abernethy; Coyt E. Murray; Magnum Capital Investments, Ltd.; Magnum Investment, Ltd; Tech Traders, Ltd.

Robert W. Shimer, Appellant at No. 08–1558

Vincent J. Firth, Appellant at No. 08–1838

Equity Financial Group, LLC, Appellant at No. 08–2495.

Nos. 08–1558, 08–1838, 08–2495.

United States Court of Appeals, Third Circuit.

Argued March 3, 2009.

Filed July 13, 2009.

Robert W. Shimer, Esquire, (Argued), Camp Hill, PA, Appellant, Pro Se and Attorney for Appellant, Equity Financial Group, LLC.

Vincent J. Firth, Medford, NJ, Appellant, Pro Se.

Martin B. White, Esquire (Argued), Lynn A. Bulan, Esquire, Washington, D.C., Attorneys for Appellee, Commodity Futures Trading Commission.

Jeffrey A. Carr, Esquire, Pepper Hamilton, Princeton, NJ, Attorney for Appellee, Stephen T. Bobo.

**152**

J. Vernon Abernethy, Belmont, NC, Appellee, Pro Se.

Before: SCIRICA, Chief Judge,
SLOVITER and HARDIMAN, Circuit
Judges.

## OPINION OF THE COURT

SCIRICA, Chief Judge.

This case involves a civil enforcement action under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, and related regulations. Defendants were charged with fraud under 7 U.S.C. §§ 6b and 6*o* and failing to register with the Commodity Futures Trading Commission, as required by 7 U.S.C. §§ 6m and 6k, among other counts. In a bench trial, the District Court concluded Equity Financial Group was regulated as a commodity pool operator, and it found defendants liable for fraudulent conduct, failing to register, and other violations. The principal issue on appeal is whether Equity Financial is a commodity pool operator under 7 U.S.C. § 1a(5), even though it operated a feeder fund—a fund that did not itself execute commodity futures transactions but invested in another fund for that purpose. We will affirm.

I

Defendants are Equity Financial; Vincent Firth, Equity Financial's president and sole shareholder; and Robert Shimer, its lawyer. They created Shasta Capital Associates, an investment vehicle that raised funds from investors through the sale of member shares. Equity Financial and Shasta Capital were distinct legal entities, but Equity Financial was the manager of Shasta Capital, controlling the Shasta Capital funds. Defendants solicited more than $15 million into Shasta Capital to trade futures contracts. Equity Financial did not execute commodity futures transactions on behalf of Shasta Capital but it invested the Shasta Capital assets in another fund, Tech Traders,[1] which pooled the Shasta Capital investment with other funds' investments, and executed transactions on behalf of the pool of funds. In this arrangement, Shasta Capital was a "feeder fund," and Tech Traders a "master pool" or "super fund."

Tech Traders and Coyt Murray, its president and chief executive officer, defrauded investors by misappropriating funds and falsely reporting Tech Traders's

---

1. We use the name Tech Traders to refer to four entities that operated in concert: Traders, Inc., Tech Traders, Ltd., Magnum Investments, Ltd., and Magnum Capital Investments, Ltd. The distinctions between these companies are irrelevant to this appeal. All four were named in the Amended Complaint along with Coyt E. Murray, the president, chief executive officer, or registered agent of the Tech Traders companies, and J. Vernon Abernathy, a certified public accountant who was retained by Murray and Tech Traders.

These companies, Murray, and Abernathy have settled with the agency and are not parties to this appeal. In a consent order, Tech Traders and Murray admitted to fraud in violation of 7 U.S.C. §§ 6b and 6*o*, failure to register as a commodity pool operator and commodity trading advisor in violation of 7 U.S.C. § 6m, and violating 17 C.F.R. § 4.30, applicable to commodity trading advisors, for trading client funds in its own accounts, among other violations. Tech Traders and Murray were enjoined from engaging in commodity trading and were ordered to pay nearly $18 million in restitution, more than $1.2 million in disgorgement, and more than $11 million in civil monetary penalties. Under a separate consent order, Abernathy was found to have engaged in fraud in violation of 7 U.S.C. § 6*o*. He was enjoined from engaging in commodity futures markets, including accounting practices involving commodity futures. He was ordered to pay restitution, jointly and severally with other defendants, up to $5 million, and he was ordered to pay a civil monetary penalty of $300,000.

performance.[2] Defendants, Equity Financial, Firth, and Shimer, participated in the fraudulent conduct. They solicited and retained Shasta Capital investors by misrepresenting their qualifications and the performance of Shasta Capital's investments, and they took a portion of the invested funds for personal use through an arrangement with Murray that was not disclosed to investors.

Defendants made several false statements to investors, primarily in monthly and quarterly reports to investors and in Internet postings. They represented that Shasta Capital was earning profits every month between June 2001 and February 2004, including double-digit rates of return in twenty-three of those thirty-three months.[3] But during this period, the Shasta Capital fund, which had invested solely in Tech Traders, was sustaining losses. Defendants' reports were based on information received from Tech Traders about Tech Traders's performance, but Firth and Shimer knew at least some of the Tech Traders reports were false or probably false.[4] Additionally, Shimer created a verification procedure that concealed the falsity of Tech Traders's reports. At Shimer's insistence, Tech Traders hired an accountant, J. Vernon Abernathy, who calculated and forwarded Tech Traders's false rate-of-return numbers to another accountant, Elaine Teag-

ue, hired by Shasta Capital. Teague relied on Abernathy's numbers in her own reports to defendants and in communications with Shasta Capital investors. But Shimer played a more direct role in the creation of Tech Traders's false reports. He invented the method Abernathy used to calculate Tech Traders's returns—a method that did not employ standard accounting practices and was misleading—and he helped Abernathy prepare many of the reports. Shimer also knew Abernathy lacked access to the records needed to calculate a proper rate of return. Apparently Teague was not aware of Shimer's involvement in the creation of the reports, the use of a nonstandard accounting procedure, or Abernathy's lack of access to necessary records. Teague accordingly provided a front to investors and potential investors, to verify the false reports.

Moreover, Firth and Shimer benefitted from an undisclosed arrangement with Murray and Tech Traders. Murray and Shimer had been involved in a prior business venture in which two other persons absconded with funds Shimer raised. Murray agreed to help Shimer repay the earlier investors if Shimer would solicit funds for Tech Traders. Under this agreement, Tech Traders would divert a portion of its "profits" back to Shimer through a trust called Shadetree in Nevis,

2. As part of their settlement with the agency, Tech Traders and Murray admitted to violating 7 U.S.C. §§ 6b and 6o by fraudulently misrepresenting the performance of the Tech Traders fund.

3. Defendants reported returns of more than 130 percent from March 2003 to February 2004, 92 percent for the year 2003, and 108 percent for 2002. In the two worst-performing months between June 2001 and February 2004, they reported gains of 4.11 percent and 9.02 percent.

4. In June 2002, Firth and Shimer learned Tech Traders's September 2001 report was false. In that month, relying on Tech Traders's reports, Shasta Capital reported a gain, but it actually suffered a loss. Neither Firth nor Shimer took any steps to correct the false September 2001 statements. Firth learned on at least three occasions that the value of Tech Traders's funds was less than the amount, based on Shasta Capital's own records, that Shasta Capital had invested with Tech Traders. These reports were inconsistent with the gains Shasta Capital was reporting to its investors and potential investors.

West Indies.[5] Neither Firth nor Shimer disclosed the Shadetree agreement to Shasta Capital investors in statements or in Shasta Capital's detailed Private Placement Memoranda.[6] Tech Traders paid $1,314,930 under the Shadetree agreement into accounts controlled by Shimer. Some of this money went to pay the earlier investors, some to pay a mortgage for Firth, and some to pay a referral fee to a former associate of Shimer.

The District Court concluded that Equity Financial was a commodity pool operator under 7 U.S.C. § 1a(5), and Firth and Shimer were statutorily defined associated persons of Equity Financial under 7 U.S.C. § 6k. It found Equity Financial liable under 7 U.S.C. § 6m for failing to register with the CFTC as a commodity pool operator, and Firth and Shimer liable under 7 U.S.C. § 6k for failing to register themselves as associated persons. The court concluded all three defendants had committed fraud under 7 U.S.C. §§ 6b and 6o.[7] Equity Financial, it held, was liable under 7 U.S.C. § 2(a)(1)(B) for Firth and Shimer's violations, and Firth and Shimer liable under 7 U.S.C. § 13c(b), as controlling persons of Equity Financial, for Equity Financial's violations, including its failure to register. Finally, the District Court concluded, Shimer is liable under 7 U.S.C. § 13c(a) for aiding and abetting Tech Traders's violation of 17 C.F.R. § 4.30. The court enjoined defendants from participating in commodity markets, and it ordered restitution, disgorgement of profits, and civil penalties. Defendants appeal from the judgment.[8]

## II

The Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, regulates the conduct of partic-

---

**5.** Under the agreement, Shadetree would receive 5 percent of Tech Traders's operating fees and half of the profits Tech Traders would take after paying other fees, costs, and a premium to investors. Firth knew Shimer owed money to the prior investors, and he knew of the agreement between Shimer and Murray.

**6.** The Private Placement Memoranda, drafted by Shimer and approved and distributed by Firth, disclosed basic information about investing with Shasta Capital. Each Shasta Capital investor received one of these Private Placement Memoranda, depending on when he or she invested. The first Memorandum was distributed to investors during the time period between June 30, 2001, and February 18, 2003; the second between February 18, 2003, and September 2, 2003; the third between September 2, 2003, and April 1, 2004.

Only the first Memorandum made any mention of the Shadetree trust. It noted the trust would receive 5 percent of Tech Trader's operating costs. It did not, however, disclose that half of Tech Trader's profits would also be diverted to Shadetree.

In addition to omitting information about the Shadetree agreement between Shimer and Murray, the Private Placement Memoran-

da contained other misrepresentations or omissions about Shimer's and Firth's qualifications, business history, and the due diligence they claimed they conducted. The first of the three Private Placement Memoranda also included false information about Tech Traders's rate of return. Shimer calculated this rate, which was purportedly based on the return from another entity's investments with Murray. Murray, however, would not verify this rate of return, and Shimer's calculations were not based on information that would allow him to calculate a proper rate of return.

**7.** In 2008, Congress amended § 6b in ways immaterial to this appeal. Food, Conservation, and Energy Act of 2008, Pub.L. No. 110–246, § 13102, 122 Stat. 1651, 2194–95. For the sake of simplicity, we refer to the pre–2008 version of the statute.

**8.** We review the District Court's findings of fact for clear error, and we exercise plenary review over its interpretation of the law and its legal conclusions. *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 478 F.3d 557, 566 (3d Cir.2007). The District Court had jurisdiction under 7 U.S.C. § 13a–1, and we have jurisdiction under 28 U.S.C. § 1291.

ipants in commodity futures markets. These markets allow producers and purchasers of agricultural commodities and other products to hedge against the risk of future price movements caused by weather and other factors. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357–58, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). For example, a farmer may sell a commodity for future delivery to protect against a price decrease; a purchaser may want to buy a commodity for future delivery to protect against a price increase. *See id.* Because market prices for these futures contracts shift, the exchanges provide a profit opportunity for investors who buy and sell the contracts even though they do not intend to take delivery of the commodity. *Id.* at 357–59 & n. 11. These investors trade in the belief the price will change favorably. *Id.* at 357, 102 S.Ct. 1825. Enticed into the market by the profit opportunity, investors are "willing to assume the market risk that the hedging farmer or [agricultural commodity] processor wants to avoid." *Id.* at 358, 102 S.Ct. 1825.

> ... The speculators' participation in the market substantially enlarges the number of potential buyers and sellers of executory contracts and therefore makes it easier for farmers and processors to make firm commitments for future delivery at a fixed price. The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.

*Id.* The presence of investors in these markets tends to broaden the market, reduce price fluctuations, and spread risk. *Id.* at 358, 359 n. 11, 102 S.Ct. 1825. Without speculative investors, "the liquidity, so badly needed in futures markets, simply would not exist." *Id.* at 359 n. 11, 102 S.Ct. 1825 (quoting H.R.Rep. No. 93–975, at 138 (1974)).

Although historically focused on agricultural commodities, participants in futures markets now exchange contracts for the future delivery of a range of assets. The CFTC has jurisdiction over certain futures contracts traded, for example, on designated contract markets. These include contracts for several listed agricultural commodities, 7 U.S.C. § § 1 a(4), 2(a)(1)(A); "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in," *id.* §§ 1 a(4), 2(a)(1)(A); and contracts of sale for future delivery of "a group or index of securities," *id.* § 2(a)(1)(C).[9]

Commodity pools, "the commodity-futures equivalent of a mutual fund,"[10] facilitate the participation of investors in the market. They are vehicles through which investors can aggregate their funds, allowing a commodity pool operator to invest them for a fee. 13 Jerry W. Markham, Commodities Regulation: Fraud, Manipulation & Other Claims § 17A:1, at 17A–1 to 17A–2 (2008). The aggregation of funds also allows the pool, and by extension its participants, to hold a diversified portfolio and ensures individual investors will not have to take delivery of commodities. *Id.*

---

9. Tech Traders traded futures contracts for the S & P 500 and NASDAQ 100 stock indices. It claimed it had developed special algorithms to identify trends in the market price of the futures contracts for these indices.

10. *Rosenthal & Co. v. CFTC,* 802 F.2d 963, 965 (7th Cir.1986) ("A commodity pool is the commodity-futures equivalent of a mutual fund; the investor buys shares in the pool and

the operator of the pool invests the proceeds in commodity futures."); *see also* 13 Jerry W. Markham, Commodities Regulation: Fraud, Manipulation & Other Claims § 17A:1, at 17A–1 (2008) ("In its features, the typical commodity pool bears a strong resemblance to mutual funds and similar investment companies that have operated for decades in the securities industry.").

at 17A–2 (*quoting* 1 Philip McBride Johnson & Thomas Lee Hazen, Derivatives Regulation § 1.11, at 1–251 (2004)). Typically the pool is organized in the form of a business entity that limits the liability of individual investors. *Id.* The amount of funds invested in commodity pools has grown immensely, from $75 million in 1976 to $600 billion in assets in 2005. *Id.* at 17A–2 & n. 4.

## III

As noted, Shasta Capital was a feeder fund that did not execute trades in its own name but instead invested its assets in the super fund Tech Traders. For this reason, defendants contend Equity Financial, Shasta Capital's manager, is not a commodity pool operator under the statutory definition in 7 U.S.C. § 1a(5).[11] We consider whether the Act requires the commodity pool operator to trade commodity futures contracts in its own name and whether Equity Financial is a commodity pool operator under the definition in § 1a(5).

## A

A commodity pool operator is defined in 7 U.S.C. § 1a(5) as

any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility. . . .

7 U.S.C. § 1a(5). A commodity pool operator must engage in a business of a particular form; it must solicit, accept, or receive funds, securities, or property; and the solicitation must have a particular purpose—trading commodity futures. The solicitation, acceptance, or receipt of funds must be "for the purpose of trading," but nothing in the statute imposes an actual trading requirement. The plain language of § 1a(5) requires only that the entity be engaged in a business of the proper form, and it solicit, accept, or receive funds for the purpose of trading.[12]

The absence of a trading requirement is consistent with the purposes of the statu-

11. The statute defines "commodity pool operator" in § 1a(5) but does not define the term "commodity pool." The term "pool" is defined by regulation as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1). This regulation is not the basis for the agency's action in this case, and accordingly is not at issue in this appeal. *See infra* note 13.

12. Highlighting the lack of an explicit trading requirement in § 1a(5), the statute defines other market participants' roles in ways more obviously associated with trading. Floor brokers and floor traders are defined as persons who purchase or sell commodities for future delivery. 7 U.S.C. § 1a(16), (17). Future commission merchants and introducing brokers are persons who solicit or accept orders for the purchase or sale of commodities for future delivery. *Id.* § 1a(20), (23); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 359, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("[F]utures commission merchants . . . solicit orders from individual traders, and . . . floor brokers . . . make the actual trades on the floor of the exchange on behalf of futures commission merchants and their customers."). Within the statutory classification, these roles differ from that of the commodity pool operator. The language in § 1a(5) neither requires a commodity pool operator to "purchase or sell" futures contracts, as floor brokers and traders do, nor does it require it to place orders, the conduct complementary to that of a futures commission merchant and introducing broker.

The definition of associated persons of commodity pool operators in 7 U.S.C. § 6k em-

tory scheme.[13] The Commodity Exchange Act is intended to "deter and prevent ... disruptions to market integrity" and "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b). The specific provisions governing commodity pool operators are directed toward regulating activities involving the solicitation of funds. "Commodity pool operator" was first defined in the 1974 Act, and testimony included in the House of Representatives Report accompanying that bill addressed the purposes of the new provisions:

> One of the ways in which unsophisticated traders have lost substantial amounts of money is through commodity advisors and commodity pool operators. This bill will provide for the registration of all such persons, establish procedures under which they will be permitted to operate and specifically eliminate certain undesirable practices which have enticed

unsuspecting traders into the markets with, far too often, substantial loss of funds.

H.R.Rep. No. 93–975, at 79 (1974) (statement of Dr. Clayton Yeutter, Assistant Secretary of Agriculture).[14] Accordingly, when Congress defined commodity pool operator, it sought to regulate the solicitation of funds from customers and potential customers. And it intended to protect them from harmful conduct, especially fraudulent solicitation. The statute would be undermined if one entity could escape regulation merely by having another execute its trades.

Defendants contend we should follow *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880 (9th Cir.1986), which, they maintain, imposes a trading requirement. Specifically, *Lopez* describes a commodity pool as

> (1) an investment organization in which the funds of various investors are solic-

---

phasizes that solicitation of funds, not trading, is the conduct in which the commodity pool operator must engage. That provision only requires registration of persons involved in the solicitation of funds or the supervision of those who solicit funds.

13. We do not decide whether the agency's regulations defining and regulating pools deserve deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The agency has asserted that "it is unnecessary for the Court to apply a *Chevron* ... analysis in this appeal." (Br. of Appellee at 34 n.12.) We note, however, that the regulations appear to comport with the interpretation we give the statute. Unlike the statute, the regulations define a pool. The regulations do not include a trading requirement, defining a pool as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1).

The regulations also cover pools that invest in other pools. The regulations define an "investee pool" as "any pool in which another pool or account participates or invests, *e.g.*,

as a limited partner thereof." *Id.* § 4.10(d)(4). A commodity pool operator must disclose the performance of investee pools in which its pool invests. *Id.* § 4.25(c)(4), (c)(5). And the regulations cover those "investor fund commodity pool operators" that do no trading of their own but invest all funds in an investee fund. *See* 17 C.F.R. Part 4 app. A (providing guidance to a commodity pool operator that "allocates the fund's assets to one or more investee funds").

14. The 1936 Act, though not defining commodity pool operators, had similar aims. The Senate Report accompanying the 1936 Act suggested that Act would "more adequately" address "[c]ertain trade practices involving the cheating of customers." S.Rep. No. 74–1431, at 3 (1935). "Clearly Congress has recognized through the years that fraudulent and deceptive conduct in connection with futures transactions can and does occur prior to the actual opening of a trading account...." *Hirk v. Agri–Res. Council, Inc.*, 561 F.2d 96, 104 (7th Cir.1977) (construing the language of 7 U.S.C. § 6b in light of the legislative history accompanying the 1936 and 1974 Acts).

ited and combined into a single account for the purpose of investing in commodity futures contracts; (2) common funds used to execute transactions on behalf of the *entire* account; (3) participants share pro rata in accrued profits or losses from the commodity futures trading; and (4) the transactions are traded by a commodity pool operator in the name of the pool rather than in the name of any individual investor.

805 F.2d at 884. Under this definition, defendants contend a person must trade in commodity futures to be a commodity pool operator. *Lopez,* however, is distinguishable: Dean Witter traded the funds at issue from its own account. *Id.* at 882 n. 2. The legal question was whether the Dean Witter investment vehicle was an entity of the proper form—"a business of the nature of an investment trust, syndicate, or similar form of enterprise"—despite the lack of pro-rata sharing of profits and losses. *Id.* at 883–84. The *Lopez* court confronted different facts and a different legal question. It did not address whether a commodity pool operator must itself execute commodity futures transactions.

■ In conclusion, the statute does not require a commodity pool operator to execute commodity futures transactions. The language of the definition lacks an explicit trading requirement, and the remedial purposes of the statute would be thwarted if the operator of a fund could avoid the regulatory scheme simply by investing in another pool rather than trading. If an entity is engaged in a business in the nature of an investment trust, syndicate, or similar form of enterprise, and it solicits, accepts, or receives funds for the purpose of trading, it is a commodity pool operator. The actual trading of commodity futures is not required.

## B

■ Under 7 U.S.C. § 1a(5), Equity Financial, as the manager of Shasta Capital, is a commodity pool operator. A commodity pool operator must be "engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise." 7 U.S.C. § 1a(5). A business takes this form when it provides a vehicle for a collective or group investment. *Lopez* aides our understanding of this provision. A business falls within this category when it combines investor funds into a single, commingled account; participants share pro rata in any profits and losses; and funds are invested or traded collectively, on behalf of the entire account, rather than in the name of individual investors. *See Lopez.,* 805 F.2d at 884; *supra* Part III.A. In *Lopez,* Dean Witter assigned each investor an individual account number, and not all investors' funds were used in each trade. 805 F.2d at 882 n. 2. Because "not all accounts shared a pro rata profit or loss," the Dean Witter investment vehicle was not a commodity pool operator. *Id.* at 884. In this case, defendants collected all investor funds in Shimer's attorney escrow account, and Shimer transferred the commingled funds from his account to Tech Traders. Tech Traders held Shasta Capital's funds in Shasta Capital's name, not in the names of Shasta Capital's investors. Under the Private Placement Memoranda, the Shasta Capital investors shared profits and losses on a pro-rata basis. Shasta Capital was accordingly a vehicle for collective, group investment. Because Equity Financial was the manager of Shasta Capital, it was engaged in a business "of the nature of an investment trust, syndicate, or similar form of enterprise."

A commodity pool operator also must "solicit[ ], accept[ ], or receive[ ] . . . funds . . . for the purpose of trading in any commodity for future delivery." 7 U.S.C.

§ 1a(5). Firth and Shimer, acting individually and through Equity Financial, solicited funds for Shasta Capital. Shimer drafted the Private Placement Memoranda, and Firth approved these documents and distributed them to potential customers. Equity Financial, Firth, and Shimer advertised the Shasta Capital fund on the Internet. As a result of these efforts, they received more than $15 million into Shasta Capital. According to the terms of a 2001 investment agreement with Tech Traders and the Private Placement Memoranda, the funds were to be invested with Tech Traders for the purpose of trading futures contracts.

Accordingly, the form of the Shasta Capital enterprise and Equity Financial's solicitation and receipt of funds for the purpose of trading futures contracts place Equity Financial squarely within the definition of a commodity pool operator.

## IV

■ Defendants challenge the District Court's conclusion that they committed fraud under 7 U.S.C. §§ 6b and 6o.[15] Specifically, they contend the evidence does not support a finding of scienter.[16] Scienter is an "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and it may be shown either by conscious behavior or recklessness. *See Drexel Burnham Lambert Inc. v. CFTC*,

**15.** As a commodity pool operator, Equity Financial is regulated by § 6o, which also governs conduct by Firth and Shimer, who are statutorily defined associated persons of Equity Financial. *See* 7 U.S.C. § 6k (requiring registration of persons associated with a commodity pool operator as a "partner, officer, employee, consultant, or agent ... in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person" so engaged). According to § 6o,

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator ... .
(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant. 7 U.S.C. § 6o. The District Court concluded the defendants violated this antifraud provision as well as the antifraud provision in § 6b. Section 6b regulates "any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person."

7 U.S.C. § 6b(a)(2) (2006). Defendants do not meaningfully challenge the applicability of § 6b to them. "[A]ppellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir.1993). Defendants failed to present a proper argument.

**16.** There are different views about whether the antifraud provision in 7 U.S.C. § 6o(1)(A) includes a scienter requirement. *Compare First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1341–42 (6th Cir.1987) ("[Section 6o] does not contain the same scienter requirement as § [6b].... [T]he complainant need prove only that the commodity trading advisor intentionally made the statements complained of, and not that the advisor acted with the intent to defraud."), *and CFTC v. Savage*, 611 F.2d 270, 285 (9th Cir.1979) (concluding a violation of § 6o(1) only requires the intent to "employ the 'device, scheme, or artifice'"), *with Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677–80 (11th Cir.1988) ("[W]e conclude that Section 6o(1)(A) contains the same *scienter* requirement as Section 10(b) and Rule 10b–5 of the federal securities laws, while Section 6o(1)(B) does not require proof of *scienter*."). Because we conclude defendants' conduct in this case demonstrates scienter, we do not also decide whether some other culpability standard would also suffice.

850 F.2d 742, 748 (D.C.Cir.1988); *First Commodity Corp. of Boston v. CFTC*, 676 F.2d 1, 6–7 (1st Cir.1982) (concluding a reckless misrepresentation suffices, "one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing"); *cf. Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 267 & n. 42 (3d Cir.2009) (noting that under federal securities law, either reckless or conscious behavior suffices).[17]

■ Firth and Shimer both knew or recklessly disregarded an obvious risk that Abernathy's reports were false. Both Firth and Shimer learned in 2002 of at least one report, the September 2001 report, that was false. Additionally, Firth learned on at least three occasions that Tech Traders did not have as much money in its accounts as the Shasta Capital records reflected. Defendants nonetheless continued reporting Abernathy's performance results as Shasta Capital's own performance results. Shimer knew Abernathy did not have access to the records he would need to calculate a rate of return. He nonetheless created a system to communicate Abernathy's false reports to investors and potential investors in a way

that would appear to be credible, verified by two certified public accountants. Furthermore, Shimer was a party to and Firth knew of the Shadetree agreement, which was not disclosed to investors, and which diverted funds into accounts controlled by Shimer. In light of their knowledge of the falsity of their statements and disclosures, these misrepresentations suffice to show Firth and Shimer acted with scienter.

## V

■ Firth and Shimer challenge the District Court's conclusion that they are liable as controlling persons for Equity Financial's failure to register with the agency.[18] Any person "who, directly or indirectly, controls any person who has violated any provision of this chapter" is liable for the controlled person's violation if he "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). Here, defendants continued operating the Shasta Capital fund without registering, despite knowing Equity Financial was in violation of the registration requirement. In the fall of 2003, two potential Shasta Capital investors contacted Firth and Shimer, telling them

---

17. "The language of [7 U.S.C. § 6b] is similar to that of § 10(b) of the Securities Exchange Act of 1934...." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 389 n. 88, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir.1999) (internal quotation marks omitted) (interpreting scienter in the context of federal securities law).

18. If commodity pool operators use the mails or any means or instrumentality of interstate

commerce, they must register with the agency under 7 U.S.C. §§ 6m and 6n. Equity Financial violated this provision because it was a commodity pool operator engaged in interstate commerce and did not register.

In addition to concluding Firth and Shimer were secondarily liable as controlling persons for Equity Financial's failure to register, 7 U.S.C. § 13c(b), the District Court concluded Shimer was secondarily liable for the same violation under the aiding and abetting provision, 7 U.S.C. § 13c(a). It is not clear whether Shimer appeals this latter holding. But if so, his brief contains no argument to this matter, and accordingly he has waived it. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

the CFTC believed registration was necessary. In light of this information, Firth and Shimer hired a law firm in October 2003 to consider Equity Financial's registration requirements. Disagreeing with Shimer's own legal analysis, the law firm believed the failure to register subjected the operation to legal action by the CFTC.[19] The law firm repeated its opinion in a December 2003 letter, and encouraged Firth and Shimer to approach the CFTC, along with Tech Traders, to cure the defects. If Tech Traders would not also register, the law firm suggested defendants would have to end their relationship with Tech Traders. Defendants, despite knowing by this time that the CFTC was investigating Shasta Capital and that Shasta Capital was not in compliance with the registration requirement, wanted to continue the relationship with Tech Traders and Murray. "[S]o long as the numbers were still there," stated Shimer, nobody wanted to jeopardize the relationship. Despite learning about the registration requirement in October 2003, Firth and Shimer continued to solicit investments into the unregistered Shasta Capital fund, and took in more than $8.5 million between November 2003 and April 2004. Firth and Shimer knew about the registration requirement and continued to operate the fund without registering. The failure to register was not a result of a good faith belief that Equity Financial did not need to register but because "the numbers were still there," numbers that furthered the fraudulent scheme.

## VI

■ The District Court concluded Shimer aided and abetted Tech Traders's violation of 17 C.F.R. § 4.30. Section 4.30 prohibits a commodity trading advisor from soliciting, accepting, or receiving client funds to purchase, margin, guarantee or secure commodity future interests of the client.[20] Shimer contends Tech Traders was not a commodity trading advisor because Shasta Capital neither traded commodity futures in its own name nor intended to do so. A commodity trading advisor is any person who (i) "for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability" of trading in any commodity for future delivery or (ii) "for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports" concerning such activities. 7 U.S.C. § 1a(6). This definition focuses on the conduct of the commodity trading advisor—Tech Traders in this case. Shasta Capital's choice to invest in the Tech Traders fund rather than trade in its own name is irrelevant to Tech Traders's status under this definition.

Additionally, Shimer contends he is not liable because he did not have the requisite mental state under 7 U.S.C. § 13c(a), the aiding and abetting provision of the Act. Section 13c(a) establishes liability for a person who "willfully aids, abets, counsels, commands, induces, or procures the commission of" a violation of the rules, regula-

---

**19.** The law firm was not privy to information that would have revealed the fraudulent conduct.

**20.** In this relationship, Tech Traders was the commodity trading advisor and Shasta Capital was its client. Tech Traders violated 17 C.F.R. § 4.30 by receiving Shasta Capital funds and using them to trade commodity future interests. Had Tech Traders established a separate fund to serve as a commodity pool, it could have acted as both a commodity pool operator and a commodity trading advisor without violating § 4.30. Accepting and trading the funds itself rather than establishing a distinct entity ran afoul of the regulation.

tions, or orders promulgated under the Act; "acts in combination or concert with any other person in any such violation;" or "willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation." 7 U.S.C. § 13c(a). Shimer's actions meet the standard. He drafted a 2001 investment agreement between Tech Traders and Shasta Capital. Under the agreement, Tech Traders received Shasta Capital funds for the purpose of trading commodity future interests in Tech Trader's name. Shimer transferred Shasta Capital funds from his attorney escrow account to Tech Traders for that purpose, and he continued doing so after being advised by his law firm in October 2003 that Tech Traders could not trade Shasta Capital funds from Tech Traders's account. At least for the period after October 2003, Shimer's conduct suffices to establish his liability for aiding and abetting Tech Traders's violation.[21]

## VII

For the foregoing reasons, we will affirm the judgment of the District Court.

---

**21.** Shimer also challenges the District Court's determination by claiming Shasta Capital did not seek or obtain a commodity interest. The evidence, however, amply demonstrates Shimer's conduct furthered the relationship between Shasta Capital and Tech Traders in which Tech Traders received Shasta Capital funds to "purchase, margin, guarantee or secure" commodity interests. *See* 17 C.F.R. § 4.30.