**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4417**

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

    v.

TED JAMES JOHNSON, JR.,

           Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Samuel G. Wilson, District Judge. (7:07-cr-00048-sgw-1)

Argued: September 24, 2010      Decided: December 23, 2010

Before TRAXLER, Chief Judge, KING, Circuit Judge, and Jerome B. FRIEDMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Brian Jay Grossman, CROWGEY & GROSSMAN, Richmond, Virginia, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Timothy J. Heaphy, United States Attorney, Jennie L. M. Waering, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, David A. Bybee, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ted James Johnson, Jr. ("Johnson") appeals his convictions on various felony charges stemming from Johnson's creation and operation of a Ponzi scheme. Johnson does not dispute his involvement in such illegal scheme nor his guilt on numerous mail and wire fraud counts, but instead argues that his convictions on certain money laundering counts should be reversed. Additionally, Johnson seeks reversal of three counts relating to the unlawful operation of a "commodity pool" based on Johnson's assertion that the applicable statute of limitations expired before he was indicted on such charges. For the reasons set forth below, we affirm the judgment of the district court on all counts.

I.

The facts of this case are largely undisputed. In 1992, Johnson and his co-conspirator, Frank Farrier ("Farrier") began a partnership known as Mountain Investments Limited ("Mountain Investments"). Johnson and Farrier portrayed themselves as commodity pool operators that pooled and traded investor funds in the commodities futures financial market. However, Johnson and Farrier were never registered with the U.S. Commodities Futures Trading Commission, as required by law.

The Mountain Investments office was located in Johnson's home and was outfitted with numerous computer monitors that were used as a prop to instill confidence in the company. Additionally, potential investors recognized Johnson as an upstanding member of the community due to his former employment as the Giles County Circuit Court Clerk as well as Johnson's position within his church. Although Johnson and Farrier claimed to have a foolproof trading system and offered potential investors very high rates of return, in reality, Mountain Investments suffered a trading loss every year it operated.

Johnson and Farrier began accepting investor funds in 1992, and they commingled those funds in various personal and business checking accounts. Although commodity futures trading accounts were set up in Mountain Investments' name, little trading ever took place. In 1995, Johnson and Farrier established a second company, Dogwood Farms Incorporated ("Dogwood Farms") for the purpose of buying, selling, and developing real estate. However, like Mountain Investments, Dogwood Farms was primarily used in furtherance of the Ponzi scheme.

Johnson's Ponzi scheme initially created the illusion of success, and several investors received full repayment of their principal as well as interest at the rates promised. To placate investors and sustain the subterfuge, Mountain Investments

4

prepared false 1099s reflecting interest on investments that had never been made.

In January of 2001, the Virginia State Corporation Commission ("SCC") began investigating Mountain Investments based on an anonymous tip. The SCC thereafter advised Johnson and Farrier that they appeared to be operating an unregistered commodity pool. Johnson and Farrier responded by advising the SCC that Mountain Investments stopped taking new investments on January 22, 2001.

Notwithstanding such representation, Johnson continued soliciting and accepting investments through Dogwood Farms using what proved to be worthless Deeds of Trust as collateral. Once such new investments were received by Dogwood Farms, the money was simply transferred into Mountain Investments accounts. Once transferred, such money was used to make payments to investors in Mountain Investments in an effort to extend the life of the fraudulent scheme. Johnson solicited new investments through Dogwood Farms in order to disguise the source of the money and avoid SCC scrutiny.

In August of 2001, Mountain Investments entered into a settlement agreement with the SCC and agreed that all investors would be repaid within one year. Mountain Investments not only failed to meet such deadline, but sought to disguise its failure

5

by sending the SCC "statements of satisfaction" for several accounts that were not repaid but were instead merely converted into Dogwood Farms investments. Unbeknownst to the investors, such conversion was merely an exchange of one fraudulent investment for another. In late 2002, at the same time Johnson's ability to obtain new funds was dwindling, the demands for repayment were increasing. The Ponzi scheme inevitably collapsed.

Several years after the collapse of his Ponzi scheme, Johnson was indicted in the United States District Court for the Western District of Virginia. Following a trial by jury, Johnson was convicted of eighteen counts of mail fraud, two counts of wire fraud, three securities frauds counts related to operating a commodity pool, one count of conspiracy to commit money laundering, four substantive money laundering counts, and eight counts of engaging in monetary transactions in property derived from specified unlawful activities.[1] Prior to his sentencing, Johnson raised the same arguments asserted in the instant appeal in a Rule 29 Motion for Judgment of Acquittal;

---

[1] The convictions for conspiracy to commit money laundering, money laundering, and engaging in monetary transaction in property derived from specified unlawful activities, are collectively referred to herein as "the money laundering counts."

however, such motion was denied. Johnson was thereafter sentenced to a term of imprisonment of two hundred months, followed by three years of supervised release.

## II.

Although Johnson's primary argument on appeal focuses on the interpretation of the Supreme Court's opinion in United States v. Santos, 553 U.S. 507 (2008), he advances such legal argument in an effort to establish that the government failed to introduce sufficient evidence to prove his guilt on several money laundering counts. Additionally, Johnson argues that there was insufficient evidence to prove that he operated a commodity pool during the limitations period.

We review challenges to the sufficiency of evidence de novo. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). "In doing so, our role is limited to considering whether there is substantial evidence, taking the view most favorable to the Government, to support the conviction." Id. (internal quotation marks and citation omitted). Evidence is substantial if "a reasonable fact-finder could accept [it] as adequate and sufficient to establish a defendant's guilt beyond a reasonable doubt." United States v. Mehta, 594 F.3d 277, 279 (4th Cir. 2010). The credibility of witnesses and conflicts in the

evidence are not assessed, as we instead assume that any discrepancies were resolved by the jury in the government's favor. Kelly, 510 F.3d at 440.

## III.

Johnson's first challenge on appeal seeks reversal of several, but not all, of his convictions on the money laundering counts based on Johnson's interpretation of United States v. Santos.[2] The government disagrees with Johnson's reading of Santos, highlighting the fractured nature of the Supreme Court's decision and arguing that Santos results in a limited rule of law that does not extend to the instant case. As discussed in detail below, we agree with the government's position.

In United States v. Santos, the Supreme Court held, in a plurality opinion, that the term "proceeds" in the federal money laundering statutes refers to "profits," not "gross receipts." Santos, 553 U.S. at 514. The underlying offense in Santos that generated the funds that were purportedly laundered was an illegal gambling operation. Although an oversimplification of

---

[2] Johnson concedes, as he must, that even were we to adopt the legal theory that he espouses, seven of the money laundering counts should be affirmed. Additionally, Johnson does not challenge his convictions on the twenty mail and wire fraud counts that resulted in twenty concurrent sentences of 180 months.

8

the holding, the four justice plurality concluded that "proceeds" always means profits based on the rule of lenity; one concurring justice concluded that "proceeds" can mean profits in some scenarios and gross receipts in others, but in Santos it meant profits, and four dissenting justices concluded that "proceeds" always means gross receipts.

In the short time since Santos was decided, circuit courts have adopted widely divergent views on the precedential value of such splintered decision. Most notably, the Fifth Circuit recently acknowledged the four-way circuit split in the wake of Santos yet "[r]eluctantly . . . refrain[ed] from joining any of these camps" and instead adopting a fifth different reading of Santos. Garland v. Roy, 615 F.3d 391, 402-03 (5th Cir. 2010). This Court has not adopted a position via published opinion, but did conclude in a recent unpublished opinion that Santos applies only to illegal gambling operations. See United States v. Howard, 309 Fed. Appx. 760, 771 (4th Cir. 2009) ("Because Santos does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.'"). Although it has no bearing on our analysis herein, Congress also acted in the wake of Santos and modified the federal money laundering statutes to expressly define

9

"proceeds" as gross-receipts <u>in all cases</u>, effectively superseding the rule of law established by the plurality and concurrence in <u>Santos</u>.[3]

Prior to <u>Santos</u>, we have held that the word "proceeds" in the federal money laundering statutes refers to gross receipts of a criminal enterprise. See <u>United States v. Singh</u>, 518 F.3d 236, 247 (4th Cir. 2008) (finding that money received by prostitutes in payment for their services that is later used to pay the cost of a motel room constitutes "proceeds"); <u>United States v. Stewart</u>, 256 F.3d 231, 250 (4th Cir. 2001) (indicating that "reinvestment" of money received from selling drugs into the drug enterprise, including using money from drug sales to purchase more drugs and to pay for courier services to ship drugs, was sufficient to support money laundering convictions); <u>see also</u> <u>United States v. Caplinger</u>, 339 F.3d 226, 233 (4th Cir. 2003) (indicating that circumstantial evidence can be sufficient to establish that a defendant used unlawful proceeds to promote and perpetuate a criminal scheme and that "records documenting

---

[3] In 2009, the following definition was added to the federal money laundering statutes: "the term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9); <u>see</u> 18 U.S.C. § 1957(f)(3) (cross referencing § 1956(c)(9)). <u>Ex post facto</u> concerns obviously prevent this Court from considering such statutory change in the context of this case.

10

specific expenditures" are not necessary).  Johnson's primary contention on appeal is that <u>Santos</u> overrules our prior precedent.

Because the plurality opinion in <u>Santos</u>, authored by Justice Scalia, depended on Justice Stevens' concurrence to form a majority, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) (internal quotation marks and citation omitted). According to dicta in the plurality opinion, the concurrence rested on narrower grounds because the concurrence held "that 'proceeds' means 'profits' [only] when there is no legislative history to the contrary."  <u>Santos</u>, 553 U.S. at 523.  Although at least one circuit has recognized such statement as defining the precedential value of <u>Santos</u>, <u>United States v. Yusuf</u>, 536 F.3d 178, 186 n.12 (3d Cir. 2008), we decline to adopt such position as it is in direct conflict with Justice Stevens' characterization of his own written opinion.  Tellingly, Justice Stevens not only labels Justice Scalia's statement as "the purest of dicta," but indicates that Justice Scalia's interpretation of the concurring opinion "is not correct." <u>Santos</u>, 553 U.S. at 528 n.7 (Stevens, J., concurring) (citation omitted).

11

In explaining the correct interpretation of his own words, Justice Stevens explains that his concurrence rests on his "conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of 'proceeds' were applied to the operation of an unlicensed gambling business." Id. Accordingly, Justice Stevens notes that "[i]n other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by Justice Alito reflects the intent of the enacting Congress." Id. As the legislative history summarized by Justice Alito's dissent suggests that proceeds always means gross receipts, Justice Stevens' narrow concurrence carves out an exception that appears to be limited only to illegal gambling operations. See United States v. Jennings, 599 F.3d 1241, 1252 (11th Cir. 2010) (treating "Justice Stevens's opinion as controlling in its narrowest form" and therefore declining to extend it to a case involving mail and wire fraud).

As the plurality opinion in Santos does not appear to extend beyond illegal gambling operations,[4] we are bound by this

---

[4] Other circuits have adopted a broader reading of Justice Stevens' concurrence, holding that it extends beyond illegal gambling cases to cases where the "merger problem" discussed in Santos would result in a significantly higher sentence. See United States v. Kratt, 579 F.3d 558, 562 (6th Cir. 2009)

Court's precedent holding that "proceeds" means gross receipts. Our precedent on this issue is most clearly demonstrated by Singh, where we held that a conviction for money laundering can be based on the use of funds from a completed crime, or completed stage of a crime, to pay "expenses" in furtherance of the continuation of the criminal enterprise. More specifically, in Singh, the head of a prostitution ring made arrangements with two motels whereby prostitutes would not pay for a motel room until after they had used it for the purpose of prostitution. Singh, 518 F.3d at 247. The payments to the motels "were made with receipts from the [prostitutes'] first daily customers, and allowed the prostitutes to service other customers thereafter." Id. at 248. Because such transactions utilized criminally derived proceeds of a completed offense, or at a minimum, a completed stage of an offense, the payments to the motels involved the use of "proceeds" within the meaning of the money

(indicating that proceeds means profits "only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence . . ."). This court need not decide whether to adopt such broader interpretation of Santos as doing so would not impact the resolution of the instant case. Tellingly, unlike in Santos where the money laundering counts carried a statutory maximum sentence four times greater than the maximum statutory penalty for illegal gambling, here, the money laundering counts have the same, or lessor, statutory maximums as the wire and mail fraud counts.

13

laundering statutes.  <u>Id.</u>  Similarly, here, the financial transactions that supported the money laundering convictions involved criminally derived proceeds of a completed offense, or at a minimum, a completed stage of an offense, as the funds at issue were obtained by Johnson through defrauding individual investors.  Furthermore, just as the payments to the motel in <u>Singh</u> helped enable the prostitutes to promote and conceal their illegal prostitution ring, here, Johnson's payments to investors helped Johnson promote and conceal his illegal Ponzi scheme.  Accordingly, Johnson fails to establish that there was insufficient evidence to sustain his convictions.[5]

---

[5] Although the accuracy of the jury instructions is not squarely before the Court, we note that the instant case was tried after <u>Santos</u> was decided and, in contrast to our ruling above, the jury instructions reflect the limitation espoused by the <u>Santos</u> plurality, i.e., that "proceeds" means "profits." (J.A. 1587, 1592, 1597).  Based on such statement of the law, which our opinion today concludes is too restrictive, the jury still convicted Johnson of all of the charged money laundering counts.  Such finding may have been based on expert testimony indicating that Johnson's companies "profited" in 2002 as they defrauded investors out of more money than they repaid. (J.A. 557-59).  We need not, however, consider the sufficiency of the evidence regarding whether Johnson's companies profited as the law only requires that the disputed transactions involved "gross receipts" of Johnson's fraudulent activities.  Accordingly, although the jury instructions needlessly restricted the term "proceeds" to "profits," such error was in Johnson's favor and does not result in any prejudice.  <u>See</u> <u>Rowland v. American General Finance, Inc.</u>, 340 F.3d 187, 191 (4th Cir. 2003) ("If we find the instructions flawed, we will not reverse unless the

14

IV.

Johnson's second challenge alleges that his convictions on three counts associated with operating a commodity pool are barred by the statute of limitations.[6] It is undisputed that a five year limitations period is applicable to the disputed counts and that, based on the date Johnson was indicted, the evidence must prove that Johnson engaged in illegal conduct after July 27, 2002. Johnson argues in his brief that because there is no evidence that he was pooling investments or trading securities after such date, the evidence is insufficient to establish that Johnson "operated" a commodity pool within the limitations period. Upon questioning by the Court at oral argument, Johnson's counsel had little choice but to acknowledge: (1) that Johnson's position relies on an exceedingly narrow interpretation of the concept of "operating" a commodity pool; and (2) that to succeed on his claim, Johnson must somehow overcome the fact that he solicited and received new funds from investors after the limitations cut-off date.

---

error seriously prejudiced the challenging party's case.") (internal quotation marks and citation omitted).

[6] Count 36 charges operation of a commodity pool without being registered, Count 37 charges embezzlement by a commodity pool operator, and Count 38 charges fraud by a commodity pool operator.

15

The issue regarding the timing of Johnson's operation of a commodity pool was properly presented to the jury as the jury instructions for the commodity pool counts expressly stated: "In order for the government to sustain its burden of proof as to [this count], you must find beyond a reasonable doubt that the defendant acted as a commodity pool operator, as defined by these instructions, after July 27, 2002." (J.A. 1606, 1612, 1617). The instructions further define a commodity pool operator as: "a person who, in connection with an investment trust or similar enterprise, solicits, accepts, or receives funds, securities, or property for the purpose of trading in commodity futures contracts." (J.A. 1607).

As highlighted by the government, the statutory definition of a commodity pool operator does not require the operator to engage in actual trading. See 7 U.S.C. § 1a(5) (defining a commodity pool operator as "any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in any commodity . . . .") (emphasis added); Commodity Futures Trading Comm'n v. Equity Financial Group LLC, 572 F.3d 150, 158 (3d Cir. 2009) ("If an entity is engaged in a business in the nature of an

16

investment trust, syndicate, or similar form of enterprise, and it solicits, accepts, or receives funds for the purpose of trading, it is a commodity pool operator. The actual trading of commodity futures is not required."). Based on such legal standard, the evidence, viewed in a light most favorable to the government, prevents Johnson's counsel from making a compelling argument on appeal. Specifically, the evidence presented to the jury reveals that, after July 27, 2002, Johnson: (1) continued soliciting funds from investors; (2) continued representing to investors that he was still trading their invested funds; and (3) continued noting in his journal that he was actively seeking out money to trade. See (J.A. 735) (testimony indicating that Johnson obtained money from an investor in August of 2002 because "he had some deal to work on" and that the investor thought Johnson was trading with his money); (J.A. 348, 738) (excerpt from Johnson's journal indicating that on August 17, 2002, Johnson "[w]orked all day on and off trying to come with something to trade "); (J.A. 1065-66) (testimony indicating that an investor loaned Johnson $30,000 in September of 2002 and that the purpose of the loan was the same as all of his prior investments, that is, "for Mr. Johnson to use to trade, to make money, to make profits, and to pay [the investor] interest"); (J.A. 348, 1063) (excerpt from Johnson's journal indicating that

17

on September 26, 2002, Johnson was "[t]rying to come up with something to trade. Working on something to trade until 10:00 p.m."; (J.A. 168-72) (testimony indicating that after an investor repeatedly contacted Johnson trying to find out why her money was not being repaid she received a letter from Johnson in October 2002 stating, inter alia, "I'm trading now").[7]

Based on the above, viewing the evidence in a light most favorable to the government, it is plain that the jury had sufficient evidence on which to find that Johnson continued to solicit and receive funds for the purpose of trading after July 27, 2002. Tellingly, although increasing demands on Johnson for repayment appear to have led to his inability to obtain enough "new" money to actually trade, his own journal entries confirm that he was actively soliciting funds after the limitations period for the purpose of making additional trades.

---

[7] The evidence further established that as late as December of 2002, Johnson convinced existing investors to transfer investments from Mountain Investments to Dogwood Farms. The accounts being transferred were part of the Mountain Investments commodity pool and the exchange of such investments may alone be sufficient to establish that Johnson was still "operating" a commodity pool in December of 2002, albeit a failing one. See United States v. United Med. and Surgical Supply Corp., 989 F.2d 1390, 1398 (4th Cir. 1993) (citing United States v. Andreas, 458 F.2d 491, 491 (8th Cir. 1971)) ("[P]rosecution for a scheme to defraud devised outside limitations period but continued into limitations period is permissible.").

Accordingly, Johnson fails to establish that the jury's verdict on the disputed counts should be reversed.

V.

For the aforementioned reasons, we affirm the judgment of the district court.

AFFIRMED